UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| MARIE ANTOINETTE LINDSEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CV 04-B-3313-NE |
| | ) |
| WADDELL MECHANICAL, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 14.) Plaintiff Marie Antoinette Lindsey has sued defendant Waddell Mechanical, Inc., alleging that defendant discriminated against her on the basis of her gender in violation of federal law. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 14), is due to be granted.

**I. SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its

burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

On August 7, 2003, plaintiff submitted an application for employment with defendant as a "combo/welder." (Doc. 14, Ex. 1.) Defendant tested plaintiff for a combination pipe welder's position two weeks later. (*Id.*; *see id.*, Ex. 3 at 24.) Defendant adheres to ASME [American Society of Mechanical Engineers] code when testing applicants for pipe welding positions. (*Id.*, Ex. 4 at 43.)

The ASME has established procedures for testing welders. (*See id*, Ex. 2 at Bates no. 00136.) These procedures govern testing of pipe welders at Waddell. (*Id*., Ex. 4 at 16; *id*., Ex. 5 at 12-13.) The Welding Performance Qualifications of the ASME code provides, in part:

> The basic premises of responsibility in regard to welding are contained within QW-103 and QW-301.2. These paragraphs require that ***each*** manufacturer or contractor . . . shall be responsible for conducting tests to qualify the performance of welders . . . in accordance with qualified Welding Procedure Specifications, which his organization employs in the construction of weldments built in accordance with the Code. The purpose of this requirement is to ensure that the manufacturer or contractor has determined that his welders . . . using his procedures are capable of developing the minimum requirements specified for an acceptable weldment. This responsibility cannot be delegated to another organization.

(*Id*., Ex. 2, § QW-300.2(a) at Bates no. 00138 (emphasis added).) The ASME Code requires that the person responsible for testing welders be trained with regard to the required examinations. (*Id*., Ex. 2, § 342.1 at Bates no. 150.)

The ASME code states, "Each organization's representative shall perform a visual examination of each completed test coupon and shall examine each test specimen to determine its acceptability." (*Id*. § 300.3 at Bates no. 00140.) A "visual examination" is defined by the code as an –

> observation of the portion of components, joints, and other piping elements that are or can be exposed to view before, during, or after . . . testing. This examination includes verification of Code and engineering design requirements for materials, components, dimensions, joint preparation, alignment, welding, bonding, brazing, bolting, threading, or other joining method, supports, assembly, and erection.

(*Id.*, § 344.2.1 at Bates no. 00150.)   Therefore, each welder hired by defendant had to pass such visual examination of his or her test weld to be hired. (*See id.*, Ex. 5 at 13.) Also, under the code, a welding test "may be terminated at any stage of the testing procedure, whenever it becomes apparent to the supervisor conducting the tests that the welder . . . does not have the required skill to produce satisfactory results." (*Id.* § 301.2 at Bates no. 140.)

Scott Bryant conducted plaintiff's welding test. (*Id.*, Ex. 3 at 24-25; *id.*, Ex. 4 at 86-87.) Defendant appointed Bryant to the position of Quality Control Manager and Non-Destructive Examiner for Waddell in 1999. (*Id.*, Ex. 14 at Bates No. 00109.) He is certified by the ASME and ASNT [American Society of Nondestructive Testing] to conduct weld tests. (*Id.*, Ex. 4 at 14-15; *id.*, Ex. 14.) Also, he has been certified in accord with SNT-TC-IA guidelines in the following areas of nondestructive weld testing fields: Visual Testing; Magnetic Particle Testing; Ultrasonic Testing; and Liquid Penetrant Testing. (*Id.*, Ex. 14 at Bates no. 111, 116, 122, 125.)

Plaintiff's welding test had three parts – two 2" pipes and one 6" pipe. (*Id.*, Ex. 3 at 24.) Bryant visually inspected plaintiffs two 2" pipe welds and approved them. (*Id.* at 38.) However, plaintiff "had a problem the first go-around" on the 6" pipe weld. (*Id.* at 26.) She testified:

> Q. What happened next?
>
> A. Then I took my six-inch and I had a problem the first go-around, a little bit of a problem with my 6010.
>
> Q. Tell me about that.

A. I must have had my – I didn't have my positioning right or something because it was eating up into the pipe.

Q. So what did – and I'm going to ask you to translate for me. What does ["]eating into the pipe["] mean?

A. Sometimes when you're not positioned right, you know, you might get off a little bit and you – you're putting your metal in there, you'd get off into like either below or up or something like that. But it looked like the pipe had been pitted any way really bad and it had been pitted and –

Q. What does –

A. There were several pits in this pipe, okay.

Q. Is that something you will encounter on a job, a pitted pipe?

A. Occasionally, not often.

. . .

A. And I thought I had cleaned it up enough, which it was my responsibility to clean it.

. . .

Q. So if you have a pipe and at the end – or coupon is pitted, you get it cleaned where the surface is beveled or smooth?

A. Right.

. . .

A. But I had figured it was my error that first go-around, because I was a little worried, you know, it had been a while since I had, you know, felt comfortable with that. . . .

(*Id.*, Ex. 3 at 26-28.)  Plaintiff admitted that she "had blown the [first] test," and that her weld was not sufficient to pass the test.  (*Id.* at 53-54.)  Bryant allowed plaintiff to try again.  (*Id.* at 28, 29, 53.)

Bryant testified that he visually examined plaintiff's second 6" pipe weld and found "an area of lack of fusion between the weld metal and the weld coupon" at the root on the inside of the pipe  (*Id.*, Ex. 14 at 97-98, 100-01.)  He said that the lack of fusion was an obvious visual defect.  (*Id.* at 103.)  Also, he testified, "The code says complete fusion and any lack of fusion is reason for rejection."  (*Id.* at 98.)  According to Bryant, defendant did not hire plaintiff because "she failed her weld test."  (*Id.* at 113.)

Plaintiff disputes Bryant's assessment of her second weld, which she testified was "fine."  (*Id.*, Ex. 3 at 58.)  Plaintiff's husband, Jerry Lindsey, a pipefitter, testified that he did not see anything wrong with plaintiff's weld.  (*Id.*, Ex. 9 at 19.)  Plaintiff and Jerry Lindsey also testified that three welders had looked at plaintiff's second weld that day – Kenny Laymon, Billy Thompson, and Joe Nix – and had seen nothing wrong.  (*Id.* at 27-29; *id.*, Ex. 3 at 60, 77.)[1]  However, these three welders testified differently.

Laymon, who has over 40 years of experience as a welder, testified that he looked at plaintiff's weld and saw "her root pass . . . wasn't tied in.  It had about a quarter inch flaw

---

[1] Jerry Lindsey also testified that Buck Hill had told him that he had seen "a whole lot worse go through."  (Doc. 14, Ex. 9 at 28.)  Hill testified that he did not remember looking at plaintiff's weld or talking to Jerry about it.  (*Id.*, Ex. 13 at 24, 27-28.)  He also testified that his opinion of the quality of plaintiff's weld "wouldn't count for nothing," because he is "not certified to make that call."  (*Id.* at 24-25.)

in it." (*Id*., Ex. 12 at 11-12, 13.) He also testified that the weld was "not tied in on a tack on both sides." (*Id*. at 12.) He said that he did not discuss the weld with plaintiff or her husband. (*Id*. at 12-13.)

Thompson, who has over 30 years of welding experience, testified that he had looked at plaintiff's weld and told her that "the weld looked good except for right at the bottom where the tack was." (*Id*., Ex. 8 at 8, 9.) He testified that there was "incomplete fusion a little bit on each side of [the bottom tack]; and plaintiff had not "tie[d] into the tacks on each side" on the root. (*Id*. at 9, 13.)

Nix, a pipe welder for around 15 years, testified that he had seen "one little bitty spot at the bottom of [the weld] . . . ." (Doc. 14, Ex. 7 at 13, 15.) He testified that he saw a "bad place" on "the root on the inside" of the 6" pipe weld, and "on the root . . . [a welder is not] allowed much of nothing." (*Id*. at 19-20, 23-24.) He said:

> A. On the root, I don't think you are allowed much of nothing.
>
> Q. You are not really allowed any spot?
>
> A. No. Not on the root, I don't think so.
>
> Q. Do you know why?
>
> A. They don't like it. I don't know why. I don't know why it is. I just know you don't do it.
>
> Q. It is just not allowed, not acceptable?
>
> A. Yeah. Well, most times it is hard to get by. If the root looks real good, you might breeze the rest of it. If you get them looking at the root any kind of way, you slipped up.

(*Id.*, Ex. 7 at 23-24.)

Although, welds may be tested by bending or by x-ray, Bryant testified that he did not bend or x-ray plaintiff's weld "[b]ecause it failed the visual inspection." (*Id.*, Ex. 4 at 102-03.)

Thompson testified that he did not believe plaintiff could pass a visual examination of her weld because of the bad spot at the root. (*Id.*, Ex. 8 at 13-14.) He said there was no reason to do a bend test because the weld had not passed a visual examination; he said:

> Q. . . . [D]id you anticipate that [spot] would be such that she wouldn't pass her test?
>
> A. Yeah.
>
> Q. Why is that?
>
> A. I mean, your root on a six-inch, that's your visual test first. Once you pass it, then you go ahead and fill it up and cap it and then you do a bend test.
>
> Q. . . . I've heard the question asked to really test a coupon, you need to bend it. Is that true?
>
> A. Yes, sir, but you have got to pass the visual first.
>
> Q. So if you see a spot on a coupon, is there any use in doing a bend test?
>
> A. No, sir, because you are only allowed the size of the rod you are using. . . .
>
> . . .
>
> Q. So the spot she had was larger than what you understand to be acceptable?

> A. Yeah, because it was on each side. It didn't tie in to the tack.
>
> Q. Would there be any reason to bend that then?
>
> A. In my opinion, no.

(*Id*. at 13-16.) Laymon and Nix also testified that there is no need to bend the weld if there is a visible bad spot. (*Id*., Ex. 7 at 29; *id*., Ex. 12 at 16.)

The court notes that the record contains evidence that approximately half of all welders tested do not pass. (*See id*., Ex. 5 at 30; *id*., Ex. 6 at 33-34.)

According to plaintiff, thirty days after she tested, she asked Bryant to let her test again. (*Id*., ex. 3 at 130.) He told her that defendant "didn't need anybody." (*Id*.) Bryant did not recall talking to plaintiff after the day of her test. (*Id*., Ex. 4 at 105-06.) Plaintiff reapplied with defendant in December 2003. (*Id*., Ex. 3 at 128.) She testified:

> I put my last application in with Waddell. I went back – I couldn't get in over the phone to retest so I went ahead and put my application back in again to retest and a lot of people saw me there. Lisa saw me, and she had informed Mr. Bryant – this is just from what Lisa is saying – that she had informed Mr. Bryant that I had reput my application back in and that he needed to retest me, that I needed the job. And he laughed at her and said that everybody needed a job.

(*Id*. at 128-29.) Plaintiff's second application is not in the record.

Jerry Lindsey, plaintiff's husband, testified that he had "heard some people say that [Bryant] didn't want . . . journeyman women on the job." (Doc. 14, Ex. 9 at 25.) He could not identify who he had heard make this statement; he said it was "just talk through the building." (*Id*.)

### III. DISCUSSION

Plaintiff alleges that defendant refused to hire her as a welder, despite her qualifications, due to her gender. (Doc. 1 ¶ 8.) To establish a prima facie case of discrimination with regard to defendant's failure to hire, plaintiff must show:

> (i) [she] belonged to a protected class; (ii) [she] was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, [she] was rejected; and (iv) the position was filled with an individual outside the protected class.

*Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir. 2005)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Defendant contends that plaintiff cannot establish that she was qualified for the position of welder because she failed her weld test. Plaintiff contends that there is a question of fact as to whether plaintiff actually failed her weld test, and that the visual examination of her weld was a "subjective evaluation," unsuitable for consideration in determining whether plaintiff established a prima facie case.

With regard to subjective evaluations, the Eleventh Circuit Court of Appeals has held:

> [T]o demonstrate that [she] was qualified for the position, a Title VII plaintiff need only show that . . . she satisfied an employer's objective qualifications. The employer may then introduce its subjective evaluations of the plaintiff at the later stages of the *McDonnell Douglas* framework. A contrary rule, under which an employer's subjective evaluation could defeat the plaintiff's initial prima facie case, cannot be squared with the structure and purpose of the *McDonnell Douglas* framework. Specifically, we have made clear that the prima facie case is designed to include only evidence that is ***objectively verifiable*** and either easily obtainable or within the plaintiff's possession. This permits the plaintiff who lacks direct evidence of invidious intent to force the employer to articulate its motives for the challenged

employment action so that the plaintiff has an opportunity to show intentional discrimination by circumstantial evidence. If we were to hold an employer's subjective evaluations sufficient to defeat the prima facie case, the court's inquiry would end, and plaintiff would be given no opportunity to demonstrate that the subjective evaluation was pretextual. Such a blind acceptance of subjective evaluations is at odds with the intent that underlies the *McDonnell Douglas* framework. This is particularly important because we have emphasized that subjective criteria can be a ready vehicle for race-based decisions. Furthermore, we cannot reconcile a rule that would essentially require a plaintiff to prove pretext as part of his prima facie case at the summary judgment stage with the Supreme Court's instruction that the plaintiff's prima facie burden is not onerous. Thus, subjective evaluations play no part in the plaintiff's prima facie case. Rather, they are properly articulated as part of the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently evaluated as part of the court's pretext inquiry.

*Id.* at 769 (emphasis in original; citations omitted).

The "subjective evaluation" at issue in this case is Bryant's visual examination of plaintiff's weld. Although the court doubts that the visual examination of a weld based on established objective standards is the type of "subjective evaluation" contemplated by the Eleventh Circuit,[2] the court assumes, without deciding, that plaintiff can establish a prima

---

[2]The cases discussing subjective evaluations generally deal with personal qualities such as leadership and personality. *See Vessels*, 408 F.3d at 768-69 (defendant argued plaintiff was unqualified "because he lacked the **leadership style** they preferred and could not provide a seamless transition")(emphasis added); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998)("For example, requirements such as the possession of '***initiative and judgement capabilities***' and the **ability 'to relate to people in a manner to win confidence and establish support**' are incapable of objective evaluation. They cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie case by showing that the plaintiff is less qualified than the applicant chosen for the promotion.")(emphasis added); *see also Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)("We have held that while objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a ***subjective quality, such as leadership or management skill***, is better left to the later stage

11

facie case of discrimination because it finds that defendant's articulated non-discriminatory reason for not hiring plaintiff is dispositive. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

Defendant contends, *inter alia*, that plaintiff cannot establish that its articulated reason for its decision not to hire her is unworthy of credence and/or that its decision was based on her gender. The court agrees.

> Once the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action. If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual. Where the plaintiff succeeds in discrediting the employer's proffered reasons, the trier of fact may conclude that the employer intentionally discriminated.

*Vessels*, 408 F.3d 763, 767-68 (11th Cir. 2005)(citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Defendant's articulated non-discriminatory reason for not hiring plaintiff is that she failed her weld test. Bryant, whose qualifications as an examiner are not challenged, testified that plaintiff failed her test because, upon visual inspection of her weld, he "found an area

---

of the *McDonnell Douglas* analysis.")(emphasis added). *Cf. Lynn v. Regents of University of California*, 656 F.2d 1337, 1345 n.8 (9th Cir. 1981)("The qualifications that are most appropriately considered at step one are those to which objective criteria can be applied, such as level of education, years of teaching experience, in general and at the particular institution, and the publication of scholarly materials.")

12

of lack of fusion between the weld metal and the weld coupon." (Doc. 14, Ex. 4 at 97.) He testified, "The code says complete fusion and any lack of fusion is reason for rejection." (*Id.* at 98.)

This reason is sufficient to meet defendant's burden. Therefore, to survive defendant's Motion for Summary Judgment, plaintiff must show a disputed issue of fact as to whether defendant's articulated reason is a pretext for unlawful discrimination.

Plaintiff may establish that defendant's articulated reason is a pretext for unlawful discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Burdine*, 450 U.S. at 256), *cert. denied* 474 U.S. 1005 (1985)). If plaintiff chooses to establish pretext by showing that defendant's articulated reason is unworthy of credence, she must attack that reason "head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). That is, plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

13

Plaintiff must show substantial evidence of a disputed issue of fact as to whether Bryant was truthful about the reason plaintiff failed her weld test and/or whether Bryant failed plaintiff because of her gender. The Eleventh Circuit has held:

> [W]e must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [the employer's] conclusion that [plaintiff] was an unsatisfactory employee. We are not interested in whether the conclusion is a ***correct*** one, but whether it is an ***honest*** one. Like all Title VII cases where pretext is an issue, ***the question the factfinder must answer is whether [the employer's] proffered reasons were a coverup for a discriminatory decision***. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)(internal citations and quotations omitted; emphasis added).

As proof that defendant's articulated reason for not hiring her is a coverup for gender discrimination, plaintiff contends 1)evidence supports a finding that her weld was adequate, 2)defendant did not perform a bend test or x-ray her weld, 3)male welders were hired despite failing their weld test, 4)she was not given another opportunity to take a weld test, and 5)Bryant had said that he did not want to hire a female journeyman.

**A. QUALITY OF PLAINTIFF'S WELD**

Plaintiff alleges that "others experienced in welding did not see any defect" in her weld. (Doc. 16 at 13 (citing doc. 14, Ex. 3 at 59-60, 86-93; *id*., Ex. 9 at 19.) Plaintiff testified that her weld was "good." (Doc. 14, Ex. 3 at 90-91.) Her husband, who is not a pipe welder, testified that he did not see anything wrong with her weld. (*Id*., Ex. 9 at 19.)

Both plaintiff and her husband testified that Billy Thompson, Kenny Laymon, and Joe Nix said that they did not see anything wrong with plaintiff's weld.[3] (*Id*. at 27-29; *id*., Ex. 3, 60, 77.)

However, Thomspon, Laymon, and Nix all testified that they actually saw a bad spot on plaintiff's weld. (*See id*., Ex. 7 at 19-20; *id*., Ex. 8 at 9-10, 13; *id*, Ex. 12 at 11-13.) They describe the same flaw that Bryant testified he saw. (*Compare id*., Ex. 14 at 97, 99-100 *with id*., Ex. 7 at 19-20; *id*., Ex. 8 at 9-10; *id*., Ex. 12, 11-13.) The opinions of plaintiff and her husband about the quality of her weld are not sufficient evidence from which a reasonable jury could infer that Bryant was untruthful about the reason he failed the plaintiff. Under the circumstances, the court cannot say that this evidence is sufficient to allow a reasonable jury to find that Bryant's articulated reason for failing plaintiff – a visible bad spot on her weld – was a coverup for gender discrimination.

## B.  FAILURE TO PERFORM BEND TEST OR X-RAY PLAINTIFF'S WELD

The Code does not require a bend test or x-ray if the weld, upon visual examination, is inadequate. Bryant, Laymon, Nix, and Thompson testified that an x-ray and/or bend test was not needed if the root weld has a bad spot in it that can be seen. (*Id*., Ex. 7 at 29; *id*., Ex. 8 at 15-16; *id.,* Ex. 12 at 15-16.) Bryant testified that he saw a bad spot on plaintiff's weld;

---

[3]The statements of plaintiff and Jerry Lindsey about what they were told by Laymon, Nix, and Thompson is inadmissible hearsay. The statements are offered for the truth of the matter – plaintiff's weld was acceptable – and they are not admissible under any exception to the hearsay rule. *See* Fed. R. Evid. 801(c), 802; *see* Fed. R. Evid. 803.

his failure to perform a bend test or x-ray of the weld is consistent with such a finding on visual examination. Therefore, the court finds that evidence that Bryant did not perform a bend test or x-ray on plaintiff's weld does not support a finding that Bryant's articulated reason for failing plaintiff was a coverup for a discriminatory decision.

### C. MALE WELDERS FAILED THE WELD TEST

Plaintiff argues that "comparable male applicants were allowed to pass the visual inspection." (Doc. 16 at 17.) Plaintiff bases this assertion solely on the testimony of Joe Nix. (*Id*. (citing doc. 14, Ex. 7 at 14.) When asked if he had "seen welds of other folks who have applied for tests that were of a similar nature that passed the visual inspection," Nix replied that he had "seen it go both ways." (Doc. 14, ex. 7 at 14.) However, Nix qualified this statement; he testified:

> Q. But there have been occasions when you have seen Mr. Bryant pass male applicants with similar kinds of blemishes in the weld; isn't that true?
>
> A. It would be hard for me to say, but yeah, like I said, I've seen it go both ways. I haven't [ever] personally went over and inspected, you know, everybody's welds.

(*Id*. at 14.) The court finds that Nix's testimony is too vague to establish that Bryant passed male welders who had visible bad spots on their welds. Moreover, the court finds that Nix's testimony that he had seen "it go both ways" is not sufficient evidence from which a reasonable jury could find that Bryant's articulated reason for failing plaintiff was a coverup for gender discrimination.

**D. PLAINTIFF NOT GIVEN ANOTHER TEST**

Plaintiff argues, "Clearly, some welders are afforded another opportunity to take the weld test when they fail on the first occasion. A reasonable jury could infer pretext from Bryant's decision not to be reasonable and offer Lindsey another chance to take the weld test." (Doc. 16 at 21.) Plaintiff bases this argument on testimony from Tommy Mackey, who was employed by defendant as a pipe fitter at the time of plaintiff's weld test. (*Id.* at 20 (citing doc. 14, ex. 11 at 9-12); doc. 14, Ex. 11 at 8.) Mackey testified that he knew of a male pipefitter who had been allowed "more than one opportunity to take and pass a weld test." (Doc. 14, Ex. 11 at 9.) He was unable to name the male welder, but described him as a black man with a wooden leg. (*Id.* at 9-10.) Mackey testified that this unnamed male welder failed his first test and was allowed to take a second test the following week. (*Id.*11-12.)[4]

The court finds that Mackey's testimony about an unnamed male welder, who failed his weld test and was allowed to take another test a week later, is not probative of whether Bryant's reason for not hiring plaintiff – that she failed her test – was a lie. Plaintiff has provided no evidence of the circumstances under which the unnamed welder failed his first test or the circumstances leading to his re-test a week later. Moreover, the evidence is

---

[4]According to Bryant's testimony, he allowed a male welder, Shane Holley, and a female welder, Diane Butler, to take a second weld test after failing the first. (Doc. 14, Ex. 4 at 69-70.) Holley was given a second test approximately one year, not one week, after he failed his first test. (*Id.* at 70-71; *id.*, Ex. 17a at Bates no. 00055-56.) No one identifies Holley as black and having a wooden leg.

17

undisputed that plaintiff was allowed to re-test after failing her first attempt on the 6" pipe; therefore, a reasonable jury could not find that Bryant had not allowed plaintiff a second test.

The court finds that evidence that an unnamed male welder was allowed to retest is not evidence from which a reasonable jury could find that Bryant was "unreasonable," as plaintiff's claims, or that his articulated reason for not hiring plaintiff – she failed her weld test – was a coverup for discrimination.

### E.  BRYANT'S COMMENT

> Plaintiff alleges:
>
> > Waddell was substantially motivated to keep female welders out of the field.  Diane Butler worked for Waddell as a welder, and in 2001 she filed a charge of sexual harassment against Waddell.  After all the trouble that incident caused for Waddell, Jerry Lindsey claims to have heard that Scott Bryant "didn't want no journeyman women on the job."

(Doc. 16 at 16 (citing doc. 14, Ex. 9 at 25.)

Jerry Lindsey testified that he had "heard some people say that [Bryant] didn't want no women on his jobs." (Doc. 14, Ex. 9 at 25.)  However, he testified that this was "just talk through the building," and that he could not name anyone he had heard actually say that Bryant did not want to hire a woman as a journeyman.  (*Id*.)

In this Circuit –

> The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. . . . Some courts, including our own, appear to have restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form." . . .

18

> . . .
>
> We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) ***must be admissible at trial for some purpose***. For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Macuba v. Deboer*, 193 F.3d 1316, 1322-24 (11th Cir. 1999)(footnotes and internal citations omitted; emphasis added).

Jerry Lindsey's testimony is hearsay within hearsay; therefore, each part of the combined statement must be admissible. Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."). Because Lindsey cannot identify who told him about Bryant's alleged statement, such statement – offered for the truth that Bryant did not want women journeymen on the job – is inadmissible hearsay. *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456-57 (11th Cir. 1997)(citing, *inter alia*, *Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1002 (3d Cir. 1988); *Cedeck v. Hamiltonian Federal Savings & Loan Association*, 551 F.2d 1136 (8th Cir. 1977)). The court has not considered Bryant's alleged statement in deciding defendant's Motion for Summary Judgment.

Based on the foregoing, the court finds that plaintiff has not presented sufficient evidence to create a question of fact as to whether defendant's articulated reason for not

hiring her – she failed her weld test – is unworthy of credence. Therefore, defendant's Motion for Summary Judgment will be granted.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting defendant's Motion for Summary Judgment, (doc. 14), and dismissing plaintiff's claims will be entered contemporaneously with this Memorandum Opinion.

Done this 30th day of December, 2005.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE